## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

GRANT MOLLA,
on behalf of the Gerdau Ameristeel
US 401(k) Retirement Plan, himself,
and all others similarly situated,

      Plaintiff,

v.                                 CASE NO.

GERDAU AMERISTEEL US, INC.,
and the GERDAU BENEFITS PLANS
ADMINISTRATIVE COMMITTEE,

      Defendants.

_____/

## CLASS ACTION COMPLAINT

On behalf of the Gerdau Ameristeel US 401(k) Retirement Plan ("Plan"), himself, and all others similarly situated, Plaintiff, Grant Molla, ("Plaintiff"), files this Class Action Complaint against Gerdau Ameristeel US, Inc. ("Gerdau" or "the Gerdau Corporate Defendant"), and the Gerdau Benefits Plans Administrative Committee ("the Gerdau Committee Defendant") (collectively, "Defendants") for breaching their fiduciary duties in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

## BRIEF OVERVIEW

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1109 and 1132, against Defendants, the Plan's fiduciaries, for breaches of fiduciary duties.

2.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which $5.6 trillion was held in 401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

3.      In a defined contribution plan, '"participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

4.      The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants

5.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A),

with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6.      Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees can compound and result in a vast difference in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

7.      The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September, 2019).

8.      The Plaintiff is a Plan participant. As of December 31, 2020, the Plan had $654,997,677 in assets and 4,291 total participants with account balances as of the end of the plan year.  Instead of leveraging the Plan's tremendous bargaining power to benefit participants and beneficiaries, Defendants caused the Plan to pay unreasonable and excessive fees for recordkeeping and other administrative services.

9.      Plaintiff has standing to bring this action on behalf of the Plan because Plaintiff participated in the Plan and was injured by Defendants' unlawful conduct.

Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, or as of the time his account was distributed (no such distribution has occurred), and what his accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

10.    For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based on factors.

11.    For example, Defendants did not adhere to fiduciary best practices to control Plan fees and expenses. To the extent that Defendants made any prudent attempt to control the Plan's expenses and to ensure the expenses were not excessive, Defendants employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to Plan participants were reasonable, and (b) that the compensation third-party service providers received from the plan for services provided were reasonable.

12.    Defendants' mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendants' actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

## JURISDICTION AND VENUE

13.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

14.     This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place. Additionally, venue is proper in this Division because Defendants are headquartered in Tampa, Florida.

## THE PLAN

15.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

16.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

17.     More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

18.     Eligible current and former employees of Gerdau are eligible participate in the Plan. The Plan provides the primary source of retirement income for many former Gerdau employees.

## THE PARTIES

### *Plaintiff & Standing*

19.     Plaintiff is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

20.     In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendants' fiduciary breaches.

21.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254.

22.     Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendants' fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

23.     To the extent the Plaintiff must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured and continues to be injured by Defendants' unlawful conduct.

24.     To establish standing, the Plaintiff need only show a constitutionally adequate injury flowing from those decisions or failures. The Plaintiff alleges such an injury for each claim.

25.     More specifically, the Plaintiff has standing because the challenged conduct, including Defendants' actions resulting in Plaintiff and the class members paying excessive recordkeeping and administrative fees, affected all Plan participants in the same way.

26.     For example, Plaintiff's individual account in the Plan suffered losses because, in fact, each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had

Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

27.    All class members have standing for the same reason. Each class member's individual account in the Plan suffered losses because, in fact, each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

28.    As a result of Defendants' actions, the Plaintiff and class members are entitled to restitution in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

### *Defendants*

29.    The Gerdau Corporate Defendant is the Plan Sponsor and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) it is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

30.    The Gerdau Corporate Defendant is also a fiduciary to the Plan because it is the Plan Administrator and exercised authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of Plan assets and has discretionary authority or

discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

31.     The Gerdau Corporate Committee Defendant is a fiduciary to the Plan because it is the Plan administrator and exercised authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of Plan assets and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

### *Additional Information on the Plan*

32.     The Gerdau Corporate Defendant established the Plan as a defined contribution plan in 2009.

33.     The Plan covers substantially all non-union employees of the Gerdau Corporate Defendant and its subsidiaries.

34.     The Gerdau Committee Defendant, established by the Board of Directors of the Company, controls, and manages the operation and administration of the Plan. More specifically, the Gerdau Committee Defendant is the Plan Administrator.

35.     Fidelity Management Trust Company (the "Trustee") serves as the Trustee of the Plan and over the Gerdau Ameristeel US Savings Plan and the Gerdau Ameristeel US 401(k) Retirement Plan Master Trust (the "Master Trust").

36.     The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

37.     All non-union employees of the Company who are not eligible to

participate in the Gerdau Ameristeel US Savings Plan are eligible to participate in the Plan.

38.     In terms of contributions, each year participants may contribute from 1% to 75% of their pre-tax annual compensation, as defined by the Plan, subject to certain Internal Revenue Code ("IRC") limitations.

39.     Plan recordkeeping and trustee fees are paid by the Plan and are reflected in the financial statements as administrative expenses.

40.     Notably, Management fees and operating expenses charged to the Plan for investments in the mutual funds within the Master Trust are deducted from income earned daily and are not separately reflected. Consequently, management fees and operating expenses are reflected as a reduction of investment return for such investments.

**CLASS ACTION ALLEGATIONS**

41.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following proposed class ("Class"):[1]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between September 1, 2016, and the present (the "Class Period").

42.     The members of the Class are so numerous that joinder of all members is impractical. According to the most recent Form 5500 filed with the U.S. Department

---

[1] Plaintiff reserves the right to propose other or additional classes or subclasses in her motion for class certification or subsequent pleadings in this action.

of Labor, there were 4,291 Plan participants with account balances, as of December 31, 2020.

43.     Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

44.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

      A.    Whether Defendants fiduciaries of the Plan;

      B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

      C.    Whether Defendants failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

      D.    The proper form of equitable and injunctive relief; and

      E.    The proper measure of relief.

45.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the

Class. Plaintiff is committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

46.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

47.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

48.     ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

49.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who

in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

50.     As described above, Defendants were (and still are) fiduciaries of the Plan because:

A.     they are so named; and/or

B.     exercised authority or control respecting management or disposition of the Plan's assets; and/or

C.     exercised discretionary authority or discretionary control respecting management of the Plan; and/or

D.     had discretionary authority or discretionary responsibility in the administration of the Plan.

51.     As a fiduciary, Defendants were/are required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan solely in the interest  of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims as the Plan here. These twin duties are referred to as the

duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

52.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

53.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

54.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted).

55.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such

an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

56.     During the Class Period, Defendants failed to act prudently or in the best interests of the Plan's participants because they caused Plan participants to pay excessive and unreasonable fees.

57.     During the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees. Additionally, Defendants failed to leverage the size of the Plan to negotiate the lowest fees for Participants. Defendants instead caused the Plan and its participants to pay excessive administration fees and excessive compensation to service providers.

58.     As set forth in detail below, Defendants breached their fiduciary duties to the Plan and its participants and beneficiaries, and is, therefore, liable for their breaches under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## SPECIFIC ALLEGATIONS

### *Improper Management of the Plan Cost the Plan's Participants Millions in Savings*

59.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

60.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan … Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[2]

61.     Higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

62.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[3] Although 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

---

[2] Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited August 31, 2022).
[3] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited August 31, 2022).

63.     Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

64.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[4] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

### *Defendants Failed to Monitor or Control the Plan's Recordkeeping and Administrative Expenses*

65.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO")

---

[4] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited August 31, 2022).

processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

66.     Nearly all recordkeepers in the marketplace offer this range of services. The services are essentially the same. Many of the recordkeeping services can be provided by recordkeepers at little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

67.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

68.     Plans routinely bargain for low recordkeeping fees. *See, e.g.*, *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) (expert opined market rate for large plans is approximately $20–$27 per plan participant); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D. Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping); *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (Doc. 562-2, Jan. 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years).

69.     The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because

recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

70.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

71.     Utilizing a revenue sharing approach is not *per se* imprudent. Plaintiff is not making a claim against Defendants merely because they used revenue sharing to pay recordkeeping fees.

72.     However, when revenue sharing is left unchecked, it can be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[5]

73.     Because revenue sharing payments are asset based, they bear no relation to actual services provided and, likewise, bear no relation to a reasonable

---

[5] Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited August 31, 2022).

recordkeeping fee and can provide excessive compensation. Again, it is important to emphasize that fees obtained through revenue sharing are tethered not to any actual services provided to the Plan; but rather, to a percentage of assets in the Plan and/or investments in mutual funds in the Plan. As the assets in the Plan increase, so too increases the recordkeeping fees that the recordkeeper pockets from the Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

74.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

75.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

76.     Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants. Additionally, to the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

77.     Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include

conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

78.     Defendants failed to prudently manage and control the Plan's recordkeeping costs and other compensation paid to the Plan's recordkeeper by failing to undertake any of the aforementioned steps.

79.     More specifically, Fidelity has been the Plan's recordkeeper during the entirety of the Class Period.

80.     Upon information and belief Defendants have failed to undertake an RFP since 2016. If Defendants had undertaken an RFP to compare Fidelity's costs with those of others in the marketplace, Defendants would have recognized that Fidelity's compensation for recordkeeping services during the Class Period has been (and remains) unreasonable and excessive.

81.     Additionally, the Plan has more than $654,997,677 of assets. This is Plan participant money. Upon information and belief, Defendants agreed that anytime Plan participants deposit or withdraw money from their individual accounts, that the money will first pass through a Fidelity clearing account.

82.     Upon information and belief, Defendants agreed Fidelity could keep all of the interest earned on Plan participant accounts while participant money is in Fidelity's clearing account. This is a form of indirect compensation that Fidelity receives as the recordkeeper for the Plan. However, Fidelity has not tracked, monitored, or negotiated the amount of compensation Fidelity receives from income it earns on Participant money. Defendants breached their fiduciary duty of prudence by allowing Fidelity to receive compensation from Plan participants without even knowing the amount of compensation Fidelity collects from interest on participant money.

83.     Fidelity also receives "direct compensation" from Plan participants. From 2015 to 2020 the direct compensation that Fidelity received from Plan participants, per participant, as disclosed on the Plan's 5500 disclosures filed with the Department of Labor were as follows:

| Year | Direct Recordkeeping Compensation |
|------|-----------------------------------|
| 2015 | $57.52 per-participant annually |
| 2016 | $47.10 |
| 2017 | $97.28 |
| 2018 | $109.28 |
| 2019 | $121.60 |
| 2020 | $107.98 |

84.     Plans of similar size pay no more than $25 per or less year per participant for recordkeeping fees. Thus, the direct compensation that Fidelity received was – on a stand-alone basis – excessive for recordkeeping. Here, the direct compensation alone was more than double what a reasonable fee should have been.

85.     In fact, Defendants' own recordkeeper has provided evidence supporting Plaintiff's position on this discrete issue. Fidelity's own retirement plan was recently sued. In that case, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

86.     But there's more. In the *Moitoso* case Fidelity went on to stipulate as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and **the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year**. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).[6]

---

[6] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added)

87.     The key takeaway from this stipulation by Fidelity, the same recordkeeper utilized in this case, is simple: Fidelity served as Gerdau's Plan's recordkeeper during much of the same time period from the *Moitoso* case when Fidelity admitted (1) ***its own plan*** didn't offer services broader or more valuable than any of the plans it served and, more importantly, (2) the value of those services ranged from between ***$14 to $17* per participant annually**.

88.     Thus, Gerdau Plan fiduciaries should have negotiated for recordkeeping and administration fees for somewhere between $14 beginning in January 2017 down to $14 per Plan participant in 2020 but failed to do so.

89.     The Plan had between 3,000 and 5,000 participants during the class period, making it eligible for some of the lowest fees on the market.

90.     In February of 20221, NEPC,[7] a widely respected national consulting group with $1.5 trillion in assets under advisement, conducted its 16th Annual Survey titled "NEPC 2020 Defined Contribution Progress Report," in which it surveyed a large number of plans both large and small.[8]

91.     The sample size and respondents included 137 Defined Contribution Plans broken up as follows: 68% Corporate; 25% Healthcare, and 8% Public, Not-for-Profit and other. The average plan had $1.1 billion in assets and 12,437 participants.

---

[7] NEPC is an independent, full-service consulting firm and provides customized investment advice to retail investors on both traditional and alternative assets, which often includes recommending third-party investment managers. *See* https://www.nepc.com/institutional/about-us/ (last visited August 17, 2022).
[8]      *See*      https://www.nepc.com/institutional/nepcs-2021-defined-contribution-plan-trends-and-fee-survey-results/ (last visited August 17, 2022).

The median plan had $512 million in assets and 5,440 participants which, of course, is comparable to this Plan both in terms of assets held and number of Plan participants. *See NEPC* Report at p, 1.

92.     The NEPC survey found that most plans with between 1,000 and 5,000 participants paid slightly over $70 per participant recordkeeping, trust, and custody fees. *See NEPC* Report at p, 12.

93.     Additionally, according to the survey, <u>no</u> plan with between 1,000 and 5,000 participants paid more than $78 per participant for recordkeeping. *See NEPC* Report at p, 12.

94.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

95.     Additionally, as noted above, Fidelity did not receive only the direct compensation in addition to the float interest compensation on Plan participant's money discussed above above—it received even more compensation for recordkeeping services through revenue sharing payments. Such revenue sharing payments are particularly problematic because they are asset-based, and they usually bear no relation to a reasonable recordkeeping fee. Rather, in large plans, like this one, revenue sharing often results in excessive compensation, especially in hundred-million-dollar plans like the one here.

96.     As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

97.     The best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan.

98.     The total amount of recordkeeping fees (both through direct and indirect payments) currently is at least $150 per participant annually, when a reasonable fee ought to be no more than $25 per participant annually.

99.     The recordkeeping fees paid to Fidelity are far greater than recognized reasonable rates for a plan with more than $654,997,677 in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace, the Plan could have obtained recordkeeping services that were comparable to superior to the typical services that would have been provided to the Plan by Fidelity.

100.    Fidelity performs tasks for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management (computing, tabulating, data processing, etc.).

101.    The services that Fidelity provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective action. Defendants' failure to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

102.    Looking at recordkeeping costs for other plans of a similar size shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees. The chart below analyzes a few well- managed plans having tens of thousands of participants with billions of dollars in assets under management:

| Name of Plan | Plan Size | Value of Plan Assets | Total Reported Recordkeeping and Admin Service Costs | Recordkeeping and Admin Costs Per-Participant[9] | Record Keeper |
|---|---|---|---|---|---|
| The Dow Chemical Company Employees' Savings Plan | 37,868 participants | $10,913,979,302 | $932,742 | $25 | Fidelity |
| The Savings and Investment Plan [WPP Group] | 35,927 participants | $3,346,932,005 | $977,116 | $27 | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 46,943 participants | $3,793,834,091 | $1,526,401 | $33 | Fidelity |
| The Rite Aid 401(k) Plan | 31,330 Participants | $2,668,142,111 | $930,019 | $30 | Alight |

103.    Defendants' Plan is much smaller. Thus, it should have been cheaper to manage. With over just over 4,000 participants and $654,997,677 in assets in 2020, Defendants should have been able to negotiate a recordkeeping cost anywhere from

---

[9] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. See Instructions for Form 5500 (2019) at pg. 27 (defining each service code), available at https://www .dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/ reporting-and-filing/form-5500/2019-instructions.pdf.

$25 per participant to $30 from the beginning of the Class Period to the present. However, Defendants simply failed to do so.

104.   As such, Defendants either engaged in little to no examination, comparison, or benchmarking of the recordkeeping/administrative fees of the Plan to those of other similarly sized 401(k) plans, or they were complicit in paying grossly excessive fees. Had Defendants conducted any examination, comparison, or benchmarking, Defendants would have known that the Plan was compensating Fidelity at an inappropriate level for its size. Plan participants bear this excessive fee burden and, accordingly, achieve considerably lower retirement savings, since the extra fees, particularly when compounded, have a damaging impact upon the returns attained by participant retirement savings.

105.   By failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, Defendants breached their fiduciary duties to the Plan.

106.   In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Defendants could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost. Defendants failed to do so and, as a result, violated their fiduciary duties under ERISA.

### *Defendants Breached Their Fiduciary Duties by Selecting More Expensive Share Classes Instead of Low-Cost Institutional Shares of the Same Funds*

107.    The Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

108.    The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets..." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id.* § 2 comment.

109.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").

110.  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

111.  As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.

112.  The chart below uses 2020 expense ratios, the most recent data available, to demonstrate how much more expensive the share classes in the Plan are than available lower-cost share classes: Fidelity Freedom® Index 2050 Fund Investor Class:

| Fund in Plan | Net Expense Ratio[10] | Lower Cost Share Class of Same Fund | Net Expense Ratio[11] |
|---|---|---|---|
| FSNJX Fidelity Freedom 2005 Fund Class K | **0.42%** | FFGFX Fidelity Freedom Index 2005 Fund Institutional Premium Class | **0.08%** |

---

[10] As of June 30, 2020.
[11] As of June 30, 2020.

| | | | |
|---|---|---|---|
| FSNKX<br>Fidelity Freedom 2010<br>Fund Class K | **0.44%** | FFWTX<br>Fidelity Freedom<br>Index 2010 Fund<br>Institutional<br>Premium Class | **0.08%** |
| FSNLX<br>Fidelity Freedom 2015<br>Fund Class K | **0.47%** | FIWFX<br>Fidelity Freedom<br>Index 2015 Fund<br>Institutional<br>Premium Class | **0.08%** |
| FSNOX<br>Fidelity Freedom 2020<br>Fund Class K | **0.51%** | FIWTX<br>Fidelity Freedom<br>Index 2020 Fund<br>Institutional<br>Premium Class | **0.08%** |
| FSNPX<br>Fidelity Freedom 2025<br>Fund Class K | **0.54%** | FFEDX<br>Fidelity Freedom<br>Index 2025 Fund<br>Institutional<br>Premium Class | **0.08%** |
| FSNQX<br>Fidelity Freedom 2030<br>Fund Class K | **0.58%** | FFEGX<br>Fidelity Freedom<br>Index 2030 Fund<br>Institutional<br>Premium Class | **0.08%** |
| FSNUX<br>Fidelity Freedom 2035<br>Fund Class K | **0.61%** | FFEZX<br>Fidelity Freedom<br>Index 2035 Fund<br>Institutional<br>Premium Class | **0.08%** |
| FSNVX<br>Fidelity Freedom 2040<br>Fund Class K | **0.65%** | FFIZX<br>Fidelity Freedom<br>Index 2040 Fund<br>Institutional<br>Premium Class | **0.08%** |

| FSNZX<br>Fidelity Freedom 2045<br>Fund Class K | **0.65%** | FFOLX<br>Fidelity Freedom<br>Index 2045 Fund<br>Institutional<br>Premium Class | **0.08%** |
|---|---|---|---|
| FSNBX<br>Fidelity Freedom 2050<br>Fund Class K | **0.65%** | FFOPX<br>Fidelity Freedom<br>Index 2050 Fund<br>Institutional<br>Premium Class | **0.08%** |
| FSNDX<br>Fidelity Freedom 2055<br>Fund Class K | **0.65%** | FFLDX<br>Fidelity Freedom<br>Index 2055 Fund<br>Institutional<br>Premium Class | **0.08%** |
| FSNFX<br>Fidelity Freedom 2060<br>Fund Class K | **0.65%** | FFLEX<br>Fidelity Freedom<br>Index 2060 Fund<br>Institutional<br>Premium Class | **0.08%** |
| FSNDX<br>Fidelity Freedom 2065<br>Fund Class K | **0.65%** | FFIKX<br>Fidelity Freedom<br>Index 2065 Fund<br>Institutional<br>Premium Class | **0.08%** |

113.    As the charts above illustrate, throughout the Class Period Defendants should have known of the existence and availability of lower-cost share classes, and they should have promptly transferred the Plan's investments in such funds to the least expensive share classes, however, with respect to all 13 of the target-date funds currently in the Plan, Defendants simply failed to do so.

114.   Defendants' failure to select the lowest-cost share class available caused Plan participants to pay excessive fees, which has and will continue to diminish the value of their individual 401(k) accounts.

115.   Qualifying for lower share classes usually requires a minimum of a million dollars for individual funds. As demonstrated in the tables above, each of the funds had more than $1 million in assets and, therefore, the Plan would have easily qualified for lower share classes for these funds.

116.   A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into institutional shares at the earliest opportunity.

117.   Yet, despite the availability of lower-cost shares, Defendants did not transfer Plan holdings in any of these funds from higher-priced share classes into the lowest-cost institutional share classes, in breach of their fiduciary duties.

118.   There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services or benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

***Defendants Breached Their Fiduciary Duties By Including Fidelity Freedom Active Suite Target Date Funds Rather Than Passively Managed Funds***

119.   As detailed above, the Plan menu consists largely of the Fidelity Freedom Active Suite of Funds (the "Active Suite"). The Active Suite offers thirteen

target-date funds, which are actively managed funds that shift the fund's asset allocation over time according to its "glide path." For example, as an investor gets closer to retirement, the target-date fund will increase the portfolio's holdings in bonds and decrease the portfolio's holdings in securities to decrease risk.

120.    The Active Suite also serves as the Plan's "Qualified Default Investment Alternative (QDIA)," which means that new contributions were automatically directed to the Active Suite unless the participant directed the contributions to other funds.[12]

121.    Largely because of the Active Suite's status as the QDIA, it holds much of the Plan's total assets.

122.    Defendants breached their fiduciary duties by continuing to offer the Active Suite to participants, even though it is both riskier and more expensive than alternatives – specifically, the Active Suite's Index fund counterpart, the Fidelity Freedom Index funds (the "Index Suite").

123.    The main difference between the two suites is that the Index Suite includes only Fidelity mutual funds that track market indices, whereas the Active Suite invests predominantly in actively managed funds to try to outperform the market indices. Notably, each Suite's glide path demonstrates both the Active and Index suites follow essentially the same strategy, given that each Suite's allocation of equities versus bonds follows the same pattern.

---

[12] *See* Gerdau Ameristeel US 401(k) Retirement Plan, "Qualified Default Investment Alternative Notice and Annual Automatic Feature(s) Notice," Participant Disclosure Notice.

124.    However, because it is actively managed, the Active Suite charges more fees and has a higher expense ratio than the Index Suite. For example, the Institutional Premium share class for each target year of the Index Suite (the baseline fund) had an expense ratio of only 0.08%, while the K share of the Active suite had expense ratios ranging from 0.42% to 0.65%.

125.    Despite active management, the Active Suite has underperformed the index benchmarks. On the other hand, the Index Suite outperformed the Active Suite in four out of the six years beginning in 2014 and continuing through 2020.[13]

126.    Additionally, each Index Suite fund bears an equal or higher rating by Morningstar – an industry analyst – than its Active Suite counterpart. Apart from three (the Income, 2005, and 2060 iterations), every single one of the thirteen funds in the Index Suite received a full five-star rating from Morningstar. In contrast, not even one of the thirteen funds in the Active Suite has a five-star rating, and only one has a four-star rating.

127.    Finally, the underlying funds that make up the mutual funds in the Active Suite are problematic. In fact, two of the largest funds in which the Active Suite is invested – Fidelity's Intrinsic Opportunities Fund and its Large Cap Stock Fund – have dramatically trailed their respective indices over their respective

---

[13] A March 2018 Reuters special report on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk. *See* "Special Report: Fidelity puts 6 million savers on risky path to retirement", https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement.

lifetimes. The Intrinsic Opportunities Fund, which represents 8.13% of the total assets of the 2040–2060 funds, has missed its benchmark Russell 3000 index by 326 basis points (3.26%) on an annualized basis over its lifetime.

128.   Not only that, the Large Cap Stock Fund, which represents 7.11% of total assets in the 2040–2060 funds, has trailed its benchmark S&P 500 Index by 357 basis points (3.57%) on an annualized basis over its lifetime. Although the Active Suite portfolio is diversified among thirty-two underlying investment vehicles, these two funds represent over 15% of the portfolio's underlying assets and have consistently underperformed their benchmarks.

129.   Likely because of the Active Suite's poor performance, many asset managers have withdrawn their investments in the Suite. For example, in 2018, the Suite experienced an estimated $5.4 billion in net outflows. In the four years prior to 2018, the Active Suite saw nearly $16 billion in total withdraws. At the same time, the Index Suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone.

130.   Unfortunately, despite other asset managers recognizing the Active Suite's poor performance when compared to the Index Suite, Defendants did not. Instead, Defendants continued offering the Active Suite – and continue using it as the Plan's default option – even through the filing date of this lawsuit.

131.   Additionally, it's also worth noting that Active Suite Fidelity Freedom Funds have recently been the subject of many retirement plan class action lawsuits, further demonstrating why a prudent fiduciary would remove such risky and costly

funds from an investment lineup. *See, e.g., Garthwait v. Eversource Energy Co.*, No. 3:20-CV-00902 (JCH), 2022 WL 3019633, at *19 (D. Conn. July 29, 2022) (denying motion for summary judgment in ERISA retirement plan case alleging breach of fiduciary duty by employer due, in part, to inclusion of Active Suite Fidelity Freedom Funds); *see also Boley v. Universal Health Servs., Inc.*, 337 F.R.D. 626, 631-636 (E.D. Pa. 2021) (granting motion for class certification in case asserting claims related to Active Suite Fidelity Freedom Funds); *In re Omnicom ERISA Litig.*, No. 20-cv-4141 (CM), 2021 WL 392487 (S.D.N.Y. Aug. 2, 2021) (denying motion to dismiss breach of fiduciary duty claim based on retention of the Active Suite Fidelity Freedom Funds over the Index Suite); *In re: Prime Healthcare ERISA Litig.*, No. 8:20-cv-01529-JLS-JDE, 2021 WL 3076649 (C.D. Cal. July 16, 2021) (same); *In re Biogen, Inc. ERISA Litig.*, No. 20-cv-11325-DJC, 2021 WL 3116331 (D. Mass. July 22, 2021) (same); *In re Quest Diagnostics Inc. ERISA Litig.*, No. 20-07936-SDW-LDW, 2021 WL 1783274 (D.N.J. May 4, 2021) (same); *Blackmon v. Zachary Hldgs.*, No. 5:20-cv-988-DAE, 2021 WL 2190907 (W.D. Tex. Apr. 22, 2021) (same); *Jones v. Coca-Cola Consol., Inc.*, No. 3:20-cv-00654-FDW-DSC, 2021 WL 1226551 (W.D.N.C. Mar. 31, 2021) (same); *In re MedStar ERISA Litig.*, No. RDB-20-1984, 2021 WL 391701 (D. Md. Feb. 4, 2021) (same).

132.   For these reasons, Defendants' inclusion of the Active Suite in the Plan demonstrates imprudent Plan management in breach of their fiduciary duties under ERISA.

133.   Finally, significantly better performing lower price target date funds are widely available with significantly lower expense ratios. For example, Vanguard offers essentially the same (but better performing) target date funds with much lower expense ratios:

| Fidelity Option | Fidelity Ticker | Expense Ratio for Fidelity Fund | Name of Vanguard Target Date Fund | Vanguard Ticker | Expense Ratio for Vanguard Fund |
|---|---|---|---|---|---|
| Fidelity Freedom 2005 Fund Class K | FSNJX | 0.42% | Vanguard Institutional Target Retirement 2005-2010 Fund Institutional Shares | VITRX | 0.09% |
| Fidelity Freedom 2010 Fund Class K | FSNKX | 0.46% | Vanguard Institutional Target Retirement 2005-2010 Fund Institutional Shares | VITRX | 0.09% |
| Fidelity Freedom 2015 Fund Class K | FSNLX | 0.49% | Vanguard Institutional Target Retirement 2015 Fund Institutional Shares | VITVX | 0.09% |
| Fidelity Freedom 2020 Fund Class K | FSNOX | 0.53% | Vanguard Institutional Target Retirement 2045 Fund Institutional Shares | VITWX | 0.09% |

| Fidelity Freedom 2030 Fund Class K | FSNQX | 0.60% | Vanguard Institutional Target Retirement 2030 Fund Institutional Shares | VTTWX | 0.09% |
|---|---|---|---|---|---|
| Fidelity Freedom 2035 Fund Class K | FSNUX | 0.63% | Vanguard Institutional Target Retirement 2035 Fund Institutional Shares | VITFX | 0.09% |
| Fidelity Freedom 2040 Fund Class K | FSNVX | 0.65% | Vanguard Institutional Target Retirement 2040 Fund Institutional Shares | VIRSX | 0.09% |
| Fidelity Freedom 2045 Fund Class K | FNSZX | 0.65% | Vanguard Institutional Target Retirement 2045 Fund Institutional Shares | VITLX | 0.09% |
| Fidelity Freedom 2050 Fund Class K | FSNBX | 0.65% | Vanguard Institutional Target Retirement 2050 Fund Institutional Shares | VTRLX | 0.09% |
| Fidelity Freedom 2055 Fund Class K | FNSDX | 0.65% | Vanguard Institutional Target Retirement 2055 Fund Institutional Shares | VIVLX | 0.09% |

| Fidelity Freedom 2055 Fund Class K | FNSDX | **0.65%** | Vanguard Institutional Target Retirement 2055 Fund Institutional Shares | VIVLX | **0.09%** |
| Fidelity Freedom 2060 Fund Class K | FNSFX | **0.65%** | Vanguard Institutional Target Retirement 2060 Fund Institutional Shares | VILVX | **0.09%** |

134.    Defendants' failure to obtain reasonably-priced and properly performing investments is further evidence of their imprudent process to review and control the Plan's costs and is further indicia of Defendants' breaches of their fiduciary duties.

### FIRST CLAIM FOR RELIEF
### *Breaches of Fiduciary Duties of Prudence*

135.    Plaintiff re-alleges and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

136.    As a fiduciary of the Plan, Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

137.    Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

138.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

139.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

1.    Find and declare that the Defendants breached their fiduciary duties as described above;

2.    Find and adjudge that Defendants personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.      Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.      Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

5.      Remove fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.      Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.      Certify the Class, appoint the Plaintiff as class representative, and appoint her counsel as Class Counsel;

9.      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.     Order the payment of interest to the extent it is allowed by law; and

11.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 8th day of September, 2022.

Respectfully submitted,

*/s/ Brandon J. Hill*
**BRANDON J. HILL**
Florida Bar Number: 37061
**LUIS A. CABASSA**
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

*/s/ Marc R. Edelman*
**MARC R. EDELMAN, ESQ.**
Fla. Bar No. 0096342
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone 813-223-5505
Fax: 813-257-0572
MEdelman@forthepeople.com
Attorney for Plaintiff