## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

GRANT MOLLA,
on behalf of the Gerdau Ameristeel
US 401(k) Retirement Plan, himself,
and all others similarly situated,

      Plaintiff,

v.                            CASE NO. 8:22-cv-02094-VMC

GERDAU AMERISTEEL US, INC.,

      Defendant.

_____/

## AMENDED CLASS ACTION COMPLAINT

On behalf of the Gerdau Ameristeel US 401(k) Retirement Plan ("Plan"), himself, and all others similarly situated, Plaintiff, Grant Molla, ("Plaintiff"), files this Amended Class Action Complaint against Gerdau Ameristeel US, Inc. ("Defendant") for breaching its fiduciary duties of prudence in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

### Brief Overview

1. This action seeks to protect the retirement savings of more than 4,500 employees who are participants in the Plan.

2. Defendant has a fiduciary duty to defray Plan expenses and to ensure the Plan does not pay excessive compensation for to third-party service providers.

3. For the class period, the Plan has paid excessive compensation to the Plan's recordkeeper, Fidelity. Plan participants will continue to pay excessive

compensation to Fidelity unless this action proceeds.

4.    Defendant has a fiduciary duty to prudently select and monitor investments offered through the Plan. The Plan is eligible – given its massive size and economies of scale – for discounted pricing on investments. Instead of taking advantage of favorable pricing, Defendant caused Plan participants to pay more for identical investments that were available to them for significantly less.

5.    Plan participants pay the price for Plan mismanagement. Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, excessive compensation to third parties and wasted savings due to paying excessive fees for investments drain the balance available upon retirement. Over time, small differences in waste compound and result in significant differences. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015)("[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan.")

6.    The impact of excessive fees and waste on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. *U.S. Dep't of Labor, A Look at 401(k) Plan Fees*, p. 2 (September, 2019).

## ERISA

7.     "ERISA is a remedial statute designed to fashion anodynes that protect the interests of plan participants and beneficiaries....Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc.*, 83 F.3d 27, 30 (1st Cir. 1996).

8.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

9.     The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants. Plaintiff seeks only Plan-wide relief in this action.

10.     Plaintiff is a Plan participant, and pursuant to ERISA, seeks relief on behalf of the Plan to hold Defendant accountable for breaching its ERISA-imposed fiduciary duties.

### *Exhaustion is Complete*

11.    Plaintiff has exhausted his administrative remedies.

### *The Parties*

12.    Plaintiff is a former employee of Defendant. Plaintiff is a current Plan participant.  Defendant is the Plan Sponsor. It is a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) it is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.  Defendant is also a fiduciary to the Plan because it is the Plan Administrator and exercised authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of Plan assets and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

### *Jurisdiction and Venue*

13.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

14.    This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place. Additionally, venue is proper in this Division because Defendant is headquartered

in Tampa, Florida. As of December 31, 2020, the Plan had $654,997,677 in assets and 4,291 total participants with account balances as of the end of the plan year. Instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants and beneficiaries, Defendant caused the Plan to pay unreasonable and excessive compensation to the Plan's recordkeeper, Fidelity and excessive fees for investments on the Plan's investment menu.

### *Plaintiff's Standing*

15.    Plaintiff has standing to bring this action on behalf of the Plan because Plaintiff was injured by Defendant's unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his Plan account currently and what his account is or would have been worth, but for Defendant's breaches of fiduciary duty as described herein.

16.    Plaintiff is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

17.    The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery.

18.    Pursuant to 29 U. S. C. § 1132(a)(2), Plaintiff has standing to sue derivatively as a participant of the Plan standing because he invested in at least one imprudent fund within the Plan, and the Plan suffered injury at large, thus affecting Plan members uniformly and in the same ways.

19.     In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches.

20.     To establish Constitutional standing (Article III standing), Plaintiff must only show a concrete and particularized injury flowing from Defendant's ERISA violations. Here, Plaintiff alleges economic loss because his Plan account was charged excessive amounts of money for compensation paid to Fidelity. Plaintiff would not have suffered economic loss if Defendant discharged its ERISA fiduciary duties to the Plan and ensured compensation paid by the Plan to Fidelity was reasonable. Plaintiff also lost money by investing his pre-tax retirement savings in investments on the Plan's investment menu when the identical investments were available for far less than what Defendant caused Plaintiff and all Plan participants to pay for the investments.

21.     To the extent Plaintiff must also show an individual injury, although §1132(a)(2) does not provide redress for individual injuries, Plaintiff must only show a constitutionally adequate injury flowing from those decisions or failures. Plaintiff satisfies this requirement, as he has suffered a concrete economic injury traceable to Defendant's imprudence and breaches of fiduciary duty – economic loss in the form of diminished retirement savings.

22.     Plaintiff has sufficiently alleged economic loss directly traceable to Defendant's imprudence and breaches of fiduciary duty. Specifically, Plaintiff

alleges he has been charged excessive compensation for recordkeeping services and excessive investment fees with respect to his investments.

23.    To the extent that Defendant made any attempt to control the Plan's expenses and to ensure the expenses were not excessive, Defendant employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to Plan participants were reasonable, and (b) that the compensation third-party service providers received from the plan for services provided were reasonable.

24.    Plaintiff also has standing because he is seeking injunctive and equitable relief on behalf of the Plan.

25.    Plaintiff's individual account in the Plan suffered losses because, in fact, each participant's account was assessed an excessive amount for recordkeeping and investment fees, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and reduced those fees to a reasonable level.

### *Class Action Allegations*

26.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following proposed class ("Class"):[1]

> All persons, except Defendant and any fiduciaries to the Plan, who were participants in or beneficiaries of the Plan, at any time between September 9, 2016, and the present (the "Class Period").

---

[1] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

27.    The members of the Class are so numerous that joinder of all members is impractical. Between 2016, the first year of the Class period, and the present, the number of Plan participants with account balances has ranged between 4,000 and 6,000 individuals.

28.    Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of Defendant's mismanagement of the Plan. Defendant treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

29.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

       A.    Whether Defendant is an ERISA fiduciary of the Plan;

       B.    Whether Defendant breached its fiduciary duty of prudence by engaging in the conduct described herein;

       C.    Whether Defendant failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

       D.    Whether Defendant caused the Plan to pay excessive compensation to Fidelity;

       E.    Whether Defendant caused the Plan to pay excessive compensation for investments;

F.   The proper form of equitable and injunctive relief; and

G.   The proper measure of relief.

30.   Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

31.   This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

32.   In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendant has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive,

declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## *The Plan*

33.    The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

34.    The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

35.    More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

36.    Eligible current and former non-union employees are eligible to participate in the Plan. Presumably, the Plan provides the primary source of retirement income for many of Defendant's former employees.

37.    Defendant established the Plan in 2009.

38.    The Plan is subject to the provisions of ERISA.

## *Fiduciary Status and Duties*

39.    ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

40.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons

who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

41.    As a fiduciary to the Plan, Defendant is required by ERISA to manage and administer the Plan solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims as the Plan here.

42.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

43.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted).

44.    It is well-established that plan fiduciaries have an obligation to monitor and control compensation paid to the Plan's recordkeeper to ensure that such compensation remains reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid by the recordkeeper and per-participant compensation and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's compensation is reasonable.

45.    A plan fiduciary must closely monitor the recordkeeper compensation paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

46.    A plan fiduciary must make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* compensation, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants. Additionally, to the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

47.    A plan fiduciary must remain informed about overall trends in the marketplace regarding the compensation being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in

other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

48.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan … Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[2]

49.    The United States Department of Labor ("DOL") guides employers are to be held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

50.    The duty to evaluate and monitor fees and investment costs includes any fees paid by the Plan or directly on a per-participant basis. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services,*

---

[2]    Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited August 31, 2022).

*Fees, and Expenses*, at 4 (July 2016).[3] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 5.

### Recordkeeper Compensation Must Be Tracked and Monitored

51.    Plan administrative services are sometimes called recordkeeping services. A recordkeeper keeps track of each participant's investments in the various options in a plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These administrative services are largely commodities and the market for them is highly competitive.

52.    Nearly all recordkeepers in the marketplace offer the same range of services. Many of the recordkeeping services can be provided by recordkeepers at very little cost.

53.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level of service. As a result of such competition, recordkeepers vigorously compete for business by offering the best price.

54.    The cost of providing recordkeeping services depends mainly on the number of participants in a plan. Plans with large numbers of participants can take

---

[3] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited August 31, 2022).

advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged for recordkeeping services on a per-participant basis.

55.    Recordkeeping expenses can be paid from plan assets, by taking money from plan participants' individual accounts, a combination of both, or a myriad of other ways.

56.    In a typical "direct" recordkeeping fee arrangement, the plan contracts with a recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services – for example, $25.00 per year, per plan participant.

57.    A flat price based on the number of participants in the plan ensures that the amount of compensation is tied to actual recordkeeping services provided and does not grow based on matters that have nothing to do with actual services provided by a recordkeeper, such as an increase in plan assets due to market growth, or greater plan contributions by employees.

58.    For illustration purposes, a plan with 5,000 participants and $500 million in assets may issue a RFP to several recordkeepers, requesting the potential recordkeepers to provide pricing based on a flat rate for a 5,000-participant plan. If the winning recordkeeper offers to provide the recordkeeping services at a flat rate of $25.00 per participant, per year, the fiduciary contracts with the recordkeeper for the plan to pay a $125,000 direct annual fee (5,000 participants

at $25.00 per participant). The recordkeeping fee is untethered to the plan's assets. If the plan's assets double to $1 billion, the recordkeeping fee is still $25.00 per participant.

59.    Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $25.00 from his or her account. The plan could reasonably determine that assessing the same fee to all participants would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per participant rate of $25.00 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $500,000,000 million dollar plan in this example, each participant would pay a direct administrative fee of 0.0025% of his or her account balance annually for recordkeeping ($125,000/$500,000,000 = 0.00025). If plan assets increase thereafter, the percentage would be adjusted downward so that the plan is still paying the same $125,000 price that was negotiated at the plan level for services to be provided to the plan.

60.    Recordkeepers in the marketplace offer an array of other fee and expense models. These often include some combination of dollar-per-head and asset-based approaches. Plaintiff is not alleging that Defendant was required to use a direct payment arrangement – or any specific payment arrangement for that

matter. Rather, Plaintiff is simply providing details on how direct payment methods operate and provide these details to partially illustrate (together with all the allegations herein) that the recordkeeper fees the Plan has paid are excessive.

61.    Defendant causes the Plan to pay Fidelity indirect compensation via revenue sharing. But Defendant has not prudently monitored, negotiated, or controlled the compensation the Plan pays Fidelity via revenue sharing. When revenue sharing is left unchecked, it adversely impacts Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[4]

62.    Because revenue sharing payments are asset-based they bear no relation to actual services provided and, likewise, bear no relation to a reasonable recordkeeping compensation and frequently result in excessive compensation to the recordkeeper. As Plan assets increase, so does the recordkeeper's compensation, *i.e.* compensation that the recordkeeper pockets from the plan and its participants. If asset-based fees are not monitored, fees skyrocket when plan assets increase.

---

[4]  Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited August 31, 2022).

63.     During the Class period, Defendant caused the Plan to enter into an agreement with Fidelity whereby the Plan compensated Fidelity, in part, for recordkeeping services from the assets of Plan via revenue-sharing from the Plan's investments.

### *Fidelity's Compensation Disclosure Failure*

64.     The Form 5500 is a disclosure document that ERISA covered plans are required to file annually, under penalty of perjury, with the U.S. Department of Labor ("DOL").

65.     The DOL describes the importance of Form 5500s on its website, "The Form 5500 Series is part of ERISA's overall reporting and disclosure framework, which is intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries under employee benefit plans."

66.     Form 5500s require plans to disclose the compensation paid to third party service providers for services rendered to the plans.

67.     The Plan's 5500s for the Plan Years 2016-2022 do not disclose any compensation paid by the Plan to Fidelity.  Presumably this is because Defendant does not even know the amount of compensation Fidelity receives from the Plan. Defendant cannot satisfy its ERISA duty of prudence to control Fidelity's compensation and to ensure the compensation is reasonable when Defendant does

not even know the amount of Fidelity's compensation and has failed to disclose the amount of Fidelity's compensation on the Plan's 5500s as required by the DOL.

### *Fidelity's Compensation Is Excessive*

68.    During the administrative remedies exhaustion process that Defendant insisted Plaintiff participate in and satisfy before proceeding with this action, Defendant provided Plaintiff with limited documents from Fidelity. These documents were not provided by Defendant to Plan participants. The information in these documents was not provided to Plan participants. These documents and the information in them would not have been provided to Plaintiff absent his participation in the administrative remedies exhaustion process. And as noted above, the information in these documents were not disclosed by Defendant in the Plan's 5500s.

69.    Defendant disclosed to Plaintiff in the administrative exhaustion process that it caused the Plan to pay Fidelity $118 per participant, per year for compensation in 2020. That amount is excessive by any reasonable measure. Fidelity's total compensation should be no more than $25 per participant. The table below shows the compensation Fidelity admitted to receiving from the Plan from 2016 to 2022.

70.

| Year | Fidelity Disclosed Compensation (Per Participant) |
|:----:|:----:|
| 2016 | $71 |

| 2017 | $89 |
|------|------|
| 2018 | $87 |
| 2019 | $112 |
| 2020 | $118 |
| 2021 | $71 |
| 2022 | $109[5] |

71.    The disclosed compensation, even if accurate, is excessive.  Defendant could have obtained the same or functionally equivalent recordkeeping services from equally qualified service providers for $25 per participant annually.

72.    However, Fidelity's "disclosed" compensation is misleading.  Fidelity purportedly "credits" the Plan for compensation Fidelity it earned from the Fidelity funds on the Plan's menu.  These credits are illusory because Plan participants paid the credits to Fidelity in the first instance and never received any credits in their individual Plan accounts. Instead, these so-called credits went to the Plan and then were re-routed to Fidelity for other ostensible or illusory services allegedly provided by Fidelity to the Plan.

73.    When the illusory credits are added back into the recordkeeping costs, the per participant compensation to Fidelity jumps significantly, more accurately depicting Fidelity's total recordkeeping compensation.

---

[5] Recordkeeping compensation derived from 2022 Form 5500.

| Year | Per Participant Compensation with Credits Added Back In |
|------|--------------------------------------------------------|
| **2016** | **$91** |
| **2017** | **$113** |
| **2018** | **$103** |
| **2019** | **$130** |
| **2020** | **$150** |
| **2021** | **$98** |

74.    Fidelity's recordkeeping compensation was excessive relative to the services it provided to the Plan. Fidelity's own retirement plan was recently sued. In that case, the "parties  stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

75.    The *Moitoso* stipulation read:

The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and **the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year**. Had the Plan been a

third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).[6]

76.    Effectively, Fidelity admits during a period of time overlapping the Class period,  (1) *its own plan* didn't offer services broader or more valuable than any of the plans it served and, more importantly, (2) the value of those services ranged from between *$14 to $17 per participant annually*.

77.    Recordkeeping costs for similarly sized plans are consistent with the *Moitoso* stipulation. The chart below reflects the compensation similarly sized Plans paid to recordkeepers for nearly identical services:

| Name of Plan | Number of Participants | Value of Plan Assets | Reported Compensation to Recordkeeper | Per Participant Reported Compensation to Recordkeeper[7] | Record Keeper |
|---|---|---|---|---|---|
| Spire Employee Savings Plan | 3,972 | $707,440,267 | $73,937 | $18.61 | Fidelity |
| Sandvik 401(k) Retirement Plan | 4,166 | $667,258,367 | $75,446 | $18.10 | T.Rowe Price |
| TK Elevator Retirement Savings Plan | 5,176 | $656m647,910 | $171,864 | $9 | Fidelity |
| Mutual of Omaha 401k Retirement Savings Plan | 5,285 | $589,127,004 | $82,425 | $15.59 | Ascensus LLC |

[6] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added)
[7] R&A costs in the chart are derived from Schedule C of the Form 5500s for the plans identified.

78.    Here, the Plan was paying much higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeper compensation.

79.    The services that Fidelity provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to Fidelity and taken corrective action. Defendant's failure to monitor and control recordkeeping compensation cost the Plan millions of dollars.

80.    Defendant did not engage in any meaningful benchmarking or analysis of the Plan's recordkeeping/administrative fees compared to other similarly sized 401(k) plans, or they were complicit in paying grossly excessive fees. Instead, Defendant relied on generalized, superficial surveys that no prudent fiduciary would rely upon under similar circumstances.

81.    If Defendant had prudent analysis, Defendant would have known that the Plan was compensating Fidelity at an inappropriate level.

82.    Plan participants ultimately pay the price for Defendant's failures in the form of diminished retirement savings, since excessive compensation to Fidelity reduces retirement savings.

83.    During the Class period, Defendant never solicited proposals from any other recordkeepers, commonly referred to as a Request for Proposal ("RFP"). Thus, no other 401(k) service provider was invited to present Defendant with alternative recordkeeping options for the Plan.

84.    Prudent fiduciaries conduct RFPs to hold recordkeepers accountable and to explore whether other recordkeepers can provide similar or better services for a lower cost. RFPs play a critical role in protecting the interests of plan participants, ensuring plan fiduciaries are in tune with market conditions and trends.

85.    If Defendant had undertaken a RFP to compare Fidelity's compensation with those of others in the marketplace, Defendant would have discovered that Fidelity's compensation during the Class period has been (and remains) unreasonable and excessive.

86.    Defendant's efforts to evaluate Fidelity's compensation during the Class period was imprudent. Defendant relied on industry surveys providing only limited, often misleading data. A prudent fiduciary would not have relied on such information to evaluate Fidelity's compensation.

87.    If Defendant had conducted a prudent analysis or conducted a RFP, it would have obtained the information required to recognize Fidelity was being over-compensated to the detriment of plan participants. Indeed, Defendant failed to even request Fidelity to reduce its compensation. Had Defendant done so, and identified the sworn statements Fidelity made in the *Moitso* action, Fidelity likely would have drastically reduced its compensation.

88.    Defendant failed to negotiate with Fidelity to reduce its compensation.

89.    Defendant failed to explore alternative cost-structures for Fidelity's compensation.

### *Fidelity's Float Compensation*

90.    In addition, Fidelity receives float compensation from the Plan.[8]

91.    With regards to the float, Defendant agreed anytime Plan participants deposit or withdraw money from their individual accounts in the Plan, the money will first pass through a Fidelity clearing account. Plan participant money typically sits in Fidelity's clearing account for 2-3 days. Defendant also agreed Fidelity could keep the investment returns and/or any interest earned on Plan participant money while the money is in Fidelity's clearing account.

92.    The Plan's annual Form 5500s show over a hundred million dollars flows in and out of the Plan annually. However, the Plan's annual Form 5500s do not disclose any compensation that Fidelity receives via float. The float compensation should have been disclosed but was not.

93.    Plaintiff obtained limited information in the administrative remedies exhaustion process about Fidelity's float compensation. In 2018 and 2019, Fidelity disclosed receiving $55,000 and $78,000 in float compensation, respectively; in 2016 ($0), 2017 ($10,000), 2020 ($5,000) and 2021 ($0).

94.    Fidelity's float compensation disclosures to Defendant are implausible. They would have been questioned by a prudent fiduciary. But

---

[8] There are no float compensation disclosures on the Form 5500s. Therefore, neither Plan participants nor the public would have been aware of Fidelity's float compensation.

Defendant did nothing. It asked no questions to Fidelity about how the float was calculated. Defendant never requested or received from Fidelity any information or calculations showing how Fidelity invested the hundreds of millions of dollars going into and out of the Plan, and what Fidelity actually earned on this money. If Fidelity earned 1% on the money flowing in and out of the Plan, it would have generated millions of dollars in additional compensation.

95.    To determine the amount of compensation Fidelity earned via float during the Class period, Plaintiff will need to subpoena Fidelity for records showing how Fidelity invested the float money, and what Fidelity earned on the investments. This is information a prudent fiduciary should already have and include in negotiating the compensation of a recordkeeper for a plan like the one here. Defendant, again, imprudently failed to do so.

96.    The DOL has issued guidance concerning fiduciary duties for payment of compensation via float. The DOL guidance takes the position that an ERISA fiduciary acts imprudently when it allows recordkeepers to receive float compensation, unless the recordkeeper discloses sufficient information to enable the plan to make an informed decision with respect to the float arrangement, the plan has reviewed and agreed to the arrangement, and the arrangement does not permit the service provider to influence the amount of its compensation.

97.    For example, in 2002, the Department of Labor issued Field Assistance Bulletin 2002-3 (Nov. 5, 2002), available at http://www.dol.gov/ebsa/regs/fab2002-3.html. Specifically, the bulletin

describes what a fiduciary needs "to consider in evaluating the reasonableness of an arrangement under which the service provider will be retaining 'float' and what information [a] service provider [is] required to disclose to plan fiduciaries with respect to such arrangements to avoid engaging in a prohibited transaction[.]" *Id.* at *1. The document then sets out steps that plan fiduciaries and service providers should take to ensure that float practices are adequately disclosed and reviewed.

98.     The DOL Bulletin lists three primary duties with respect to float compensation for plan fiduciaries, related to their responsibility for conducting a prudent and competent review of float compensation, and three primary duties for a service provider to a plan, primarily related to fully disclosing to plan fiduciaries how float compensation is to be earned. A fiduciary is required to: (1) review comparable providers to determine for whom float is credited; (2) review the circumstances under which float is earned (such as the inclusion of time limits for earning float income); and (3) review sufficient information to evaluate float as part of the total compensation to be paid for the services rendered under the agreement. *Id.* A service provider is required to: (1) disclose the specific circumstances under which float compensation is taken and maintained, (2) establish and adhere to time frames with respect to depository and redemptive float, and (3) disclose the rate and manner by which float is earned.

99.     Defendant breached its fiduciary duty of prudence by allowing Fidelity to receive compensation from Plan participants via float without even knowing    the    actual    amount    of    compensation    Fidelity    collects    from

interest/earnings on participant money as to the float, and because the amount of indirect compensation Fidelity receives via the float is a component of the excessive compensation relative to the specific services provided to the Plan by Fidelity, and excessive relative to prudent options in the marketplace, and otherwise utterly failing to comply with DOL guidance concerning how prudent fiduciaries ought to treat float compensation.

100.   Defendant has not tracked, monitored, or negotiated the amount of compensation Fidelity receives from the return it earns on Plan participant money while the money is in Fidelity's clearing account. Discovery will prove Fidelity earned significantly more than the amounts disclosed.

### Plan Participants Paid Excessive Investment Fees for Fidelity Funds

101.   Investment companies offer pricing discounts to retirement plans. The discounts are typically in the "share class" of a mutual fund. The underlying fund is the same, the only distinction is the share class designation which correlates to the cost, *i.e.* expense ratio, paid by participant on his/her investment in the fund. Here, Defendant selected more expensive share classes than identical, less expensive share classes of the same mutual fund. Except for the extra fees, the share classes are/were identical.

102.   Defendant failed to prudently monitor and select proper share classes of many of the investments in the Plan's menu.

103.   When, as here, fiduciaries fail to select prudent investments or fail to

remove an imprudent investment from a plan within a reasonable time, it is a breach of ERISA's fiduciary duties. *Hughes v. Nw. Univ*., 211 L. Ed. 2d 558, 142 S. Ct. 737, 742 (2022).

104.    Defendant's imprudent choices as to share classes resulted in millions of dollars in excessive compensation paid by the Plan and its participants.

105.    The Uniform Prudent Investor Act ("UPIA"), which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets..." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

106.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").

107.    Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether

any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

108.   As demonstrated by the chart below, in several instances during the Class period, Defendant failed to prudently monitor the Plan to determine whether the Plan was offering the prudent lowest-cost share class available to the Plan, which are identical to the mutual funds in the Plan in every way except for their lower cost.

109.   The chart below uses 2020, the middle of the Class period, to illustrate the cost difference between the Plan's funds and the identical funds offered by Fidelity in the K6 share class:

| Fund in Plan | Expense Ratio[9] | Lower Cost K6 Share Class |
|---|---|---|
| Fidelity Contrafund K | 0.77% | 0.45% |
| Fidelity Freedom 2005 Fund Class K | 0.42% | 0.37% |
| Fidelity Freedom 2010 Fund Class K | 0.44% | 0.39% |
| Fidelity Freedom 2015 Fund Class K | 0.47% | 0.41% |
| | | |

---

[9] As of June 30, 2020.

| | | |
|---|---|---|
| Fidelity Freedom 2020 Fund Class K | **0.51%** | **0.43%** |
| Fidelity Freedom 2025 Fund Class K | **0.54%** | **0.45%** |
| Fidelity Freedom 2030 Fund Class K | **0.58%** | **0.47%** |
| Fidelity Freedom 2035 Fund Class K | **0.61%** | **0.50%** |
| Fidelity Freedom 2040 Fund Class K | **0.65%** | **0.50%** |
| Fidelity Freedom 2045 Fund Class K | **0.65%** | **0.50%** |
| Fidelity Freedom 2050 Fund Class K | **0.65%** | **0.50%** |
| Fidelity Freedom 2055 Fund Class K | **0.65%** | **0.50%** |
| Fidelity Freedom 2060 Fund Class K | **0.65%** | **0.50%** |
| Fidelity Freedom 2065 Fund Class | **0.65%** | **0.50%** |

110.   Throughout the Class period Defendant should have known of the existence and availability of the lower-cost K6 share class, and Defendant should have promptly offered the more prudent lower-cost share class on the Plan's investment menu, however, Defendant simply failed to do so.

111.    Defendant's failure to select the prudent lower-cost share class available caused Plan participants to pay excessive investment fees, which has and will continue to diminish the value of their individual accounts in the Plan.

112.    There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services or benefits based on its selection of more expensive share classes; the only consequence was higher investment costs for Plan participants.

113.    Although Defendant may argue it was prudent to offer the more expensive share classes on the Plan's investment menu because the expensive share classes pay revenue sharing to Fidelity and that money was used to compensate Fidelity for recordkeeping services to the Plan, that arguments is unavailing because Fidelity's compensation was already excessive. The more expensive share classes simply exacerbated and added to Fidelity's excessive and unreasonable compensation.

114.    Even if the revenue sharing credits are subtracted, the difference is still nearly $2,000,000 to the Plan's detriment.[10]

115.    The excessive investment fees were triple the alleged revenue credit. Spending an additional $3.00 from the Plan's assets to generate a $1.00 return is imprudent.

---

[10] Plaintiff asserts Plan participants did not receive the benefit of the revenue sharing between Fidelity and Defendant.

116.   Defendant did not conduct a substantive cost analysis of the K and K6 share classes compared to the revenue sharing credit.

117.   Plan participants did not benefit from ostensible revenue sharing credits – to the extent Plan participants received any benefit it was not commensurate with the additional costs they paid to invest in their retirement savings in high-cost investment products when identical investments were offered at a much lower-cost.

118.   The revenue sharing did not benefit Plan participants, who paid excessive recordkeeping fees and incurred higher investment costs. To make matters even worse, Defendant disclosed that ostensible revenue sharing compensation paid by Plan participants here were used by Defendant to pay administrative expenses for other retirement plans Defendant sponsors or credited directly to Defendant. Defendant breached ERISA's duty of prudence and loyalty by taking Plan assets and using those assets to compensate Fidelity for services Fidelity ostensibly provides to other retirement plans or taking those assets for Defendant's own benefit and to the detriment of Plan participants.

119.   The revenue sharing arrangement, in pertinent part, was disclosed in the Plan's Plan Year 2020 Form 5500:

Effective October 1, 2014, the MTA was amended to include a revenue credit arrangement. The Trustee will make an annual payment of $200,000, prorated across all plans on the Master Trust and the Gerdau MacSteel Savings Plan and Gerdau MacSteel Savings Plan for Bargaining Employees. The revenue credit will be funded on a quarterly basis. Such amount may be applied to reimburse the Company for expenses paid on behalf of the Plan or to directly pay plan administrative expenses. Effective April 1, 2015, any amounts unused for expenses may be allocated to the accounts of the participants, provided that such allocation shall not occur more frequently than quarterly. The Plan or the Company may make a payment to the Trustee for administrative expenses not covered by revenue sharing. During the Plan year ended December 31, 2020, revenue credit received by the plan amounted to $146,611, and administrative fees paid from the revenue credit account amounted to $135,920. During 2020, the change in market value of the revenue credit account amounted to $15,021 At December 31, 2020 and 2019, the balance in the revenue credit account amounted to $166,976 and $141,264, respectively.

120.    Pursuant to the 2020 Form 5500, Fidelity deposited revenue sharing funds into Defendant's revenue credit account on a quarterly basis. Defendant received $146,611 in revenue credit in 2020. The revenue credit account had balances of $166,976 and $141,264, respectively, in 2020 and 2019.

121.    The revenue credits are unaccounted for and were not used by Defendant to defray reasonable Plan expenses. If the revenue credits had been used to defray Plan expenses, the revenue credit account balances would have been much lower.

122.    Defendant did not allocate revenue credits to Plan participant accounts.

123.    Plaintiff's account statements contain no evidence of any revenue sharing credits allocated to his account during the Class period.

124.    Plan participants did not derive any benefit from the revenue credits. The revenue sharing arrangement, which allocated a portion of the investment fees to Fidelity for recordkeeping and a credit to Defendant, did not benefit the Plan or its participants.

125.    The asset-based direct compensation to Fidelity was already excessive; there was no reason for the Plan, or its participants, to compensate Fidelity even more, indirectly, through revenue sharing.

126.    Fidelity and Defendant, not participants, derived the benefit of the revenue sharing.

### FIRST CLAIM FOR RELIEF
### *Breaches of Fiduciary Duties of Prudence*

127.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Amended Complaint as if fully set forth herein.

128.    As a fiduciary of the Plan, Defendant was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties include administering the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

129.    Defendant breached these fiduciary duties in multiple respects as discussed throughout this Amended Complaint. Defendant failed to monitor or control the grossly excessive compensation paid to Fidelity. Defendant failed to offer prudent investment share classes on the Plan's investment menu.

130.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendant complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

131.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to

equitable relief and other appropriate relief for Defendant's breaches as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

1. Find and declare that the Defendant breached its fiduciary duties as described above;

2. Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3. Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4. Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5. Remove fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6. Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7. Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.      Certify the Class, appoint the Plaintiff as class representative, and appoint his counsel as Class Counsel;

9.      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.      Order the payment of interest to the extent it is allowed by law; and

11.      Grant other equitable or remedial relief as the Court deems appropriate.

Dated August 9th, 2024

Respectfully submitted,

**/s/ Brandon J. Hill**
**BRANDON J. HILL**
Florida Bar Number: 37061
**LUIS A. CABASSA**
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**/s/ Marc R. Edelman**
**MARC R. EDELMAN, ESQ.**
Fla. Bar No. 0096342
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone 813-577-4722
Fax: 813-257-0572
MEdelman@forthepeople.com

- 38 -

Attorney for Plaintiff

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on the 9th day of August 2024, I electronically filed a true and correct copy of the forgoing with the Clerk of the Court via the CM/ECF filing system which will send a notice of electronic filing to all counsel of record.


*/s/ Marc R. Edelman*
**Marc R. Edelman, Esq.**